Filed 9/19/19

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| JAMES LINDSTROM et al., | D074132 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2016-00026574-CU-WM-NC) |
| CALIFORNIA COASTAL COMMISSION, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Ronald F. Frazier, Judge.  Reversed and remanded with directions.


Xavier Becerra, Attorney General, Daniel A. Olivas, Assistant Attorney General, Jamee Jordan Patterson and Hayley Peterson, Deputy Attorneys General, for Defendant and Appellant.

Environmental Law Clinic, Mills Legal Clinic at Stanford Law School, Molly Loughney Melius, Thomas Miller and Annelise Corriveau as Amicus Curiae on behalf of Defendant and Appellant.

The Jon Corn Law Firm, Jonathan C. Corn, Anders T. Aannestad, Arie L. Spangler and Lee M. Andelin, for Plaintiffs and Appellants.

This case concerns an appeal and cross appeal from the trial court's ruling on a petition for writ of administrative mandate that James and Karla Lindstrom (the Lindstroms) filed against the California Coastal Commission (the Commission) challenging certain special conditions that the Commission placed on its approval of the Lindstroms' plan to build a house on a vacant oceanfront lot on a bluff in Encinitas. The Commission's appeal challenges the trial court's disapproval of the special conditions requiring (1) the home to be set back 60 to 62 feet from the edge of the bluff, instead of the 40-foot setback approved by the City of Encinitas (the City); and (2) a waiver by the Lindstroms of any right to construct a shoreline protective device, such as a seawall, to protect the home from damage or destruction from natural hazards at any time in the future. The Lindstroms cross-appeal from the trial court's approval of the special conditions requiring (1) removal of the home from the parcel if any government agency orders that it not be occupied due to a natural hazard; and (2) performance of remediation or removal of any threatened portion of the home if a geotechnical report prepared in the event the edge of the bluff recedes to within 10 feet of the home concludes that the home is unsafe for occupancy.

On our de novo review of the trial court's decision, we conclude that with one exception the Commission's imposition of the special conditions identified by the parties was within its discretion. Specifically, the condition requiring removal of the home from the parcel if any government agency orders that it not be occupied due to a natural

2

hazard, including erosion or a landslide, as currently drafted, is overbroad, unreasonable and does not achieve the Commission's stated purpose in drafting it. Therefore, we will reverse the judgment and direct the trial court to enter a new judgment ordering the Commission to either delete the special condition or to revise it to more narrowly focus on its intended purpose.

I.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *The Lindstroms' Application to the City for a Coastal Development Permit*

The Lindstroms own a vacant 6,776 square foot lot on an approximate 70 foot-high ocean-top bluff in Encinitas north of Moonlight State Beach (the Lot). In December 2012, the Lindstroms filed with the City an application for a coastal development permit to build a two-story 3,553 square foot home with a 1,855 square foot underground basement and a 950 square foot garage. The seaward side of the structure would be set back 40 feet from the edge of the bluff.

Coastal development in the City is governed by the City's Local Coastal Program (LCP), which was certified by the Commission in the mid-1990s.[1] The City's LCP requires that permit applications for development in the Coastal Bluff Overlay Zone, where the Lot is located, be accompanied by a geotechnical report prepared by "a certified engineering geologist." (Encinitas Mun. Code, ch. 30.34, § 30.34.020D.) "The

---

[1]      Although the record does not contain documents reflecting the Commission's certification of the City's LCP, the parties agree that it was certified by the Commission in 1994 or 1995.

3

review/report shall certify that the development proposed will have no adverse [e]ffect on the stability of the bluff, will not endanger life or property, and that any proposed structure or facility is expected to be reasonably safe from failure and erosion over its lifetime without having to propose any shore or bluff stabilization to protect the structure in the future." (Encinitas Mun. Code, § 30.34.020D.) The City's LCP lists certain aspects of bluff stability that the geotechnical report shall consider.[2] It further states that "[t]he report shall also express a professional opinion as to whether the project can be designed or located so that it will neither be subject to nor contribute to significant geologic instability throughout the life span of the project." (Encinitas Mun. Code, § 30.34.020D.11, 1st par.)

---

[2] The City's LCP specifically states, "Each review/report shall consider, describe and analyze the following: [¶] 1. Cliff geometry and site topography, extending the surveying work beyond the site as needed to depict unusual geomorphic conditions that might affect the site. [¶] 2. Historic, current and foreseeable cliffs erosion, including investigation or recorded land surveys and tax assessment records in addition to land use of historic maps and photographs where available and possible changes in shore configuration and sand transport. [¶] 3. Geologic conditions, including soil, sediment and rock types and characteristics in addition to structural features, such as bedding, joints and faults. [¶] 4. Evidence of past or potential landslide conditions, the implications of such conditions for the proposed development, and the potential effects of the development on landslide activity. [¶] 5. Impact of construction activity on the stability of the site and adjacent area. [¶] 6. Ground and surface water conditions and variations, including hydrologic changes caused by the development (e.g., introduction of irrigation water to the groundwater system; alterations in surface drainage). [¶] 7. Potential erodibility of site and mitigating measures to be used to ensure minimized erosion problems during and after construction (i.e., landscaping and drainage design). [¶] 8. Effects of marine erosion on sea cliffs and estimated rate of erosion at the base of the bluff fronting the subject site based on current and historical data. [¶] 9. Potential effects of seismic forces resulting from a maximum credible earthquake. [¶] 10. Any other factors that might affect slope stability. [¶] 11. Mitigation measures and alternative solutions for any potential impacts." (Encinitas Mun. Code, § 30.34.020D.1-11.)

As centrally relevant in this case, the City's LCP states, "In addition to the above, each geotechnical report shall include identification of the daylight line behind the top of the bluff established by a bluff slope failure plane analysis.  This slope failure analysis shall be performed according to geotechnical engineering standards, and shall: [¶] a. Cover all types of slope failure. [¶] b. Demonstrate a safety factor against slope failure of 1.5. [¶] c. Address a time period of analysis of 75 years."  (Encinitas Mun. Code, § 30.34.020D.11, 1st par. a-c.)

As required by the City's LCP, the Lindstroms submitted a geotechnical report by Geotechnical Exploration, Inc. (GEI) as part of their permit application to the City, which addressed, among other things, erosion and bluff stability over the next 75 years. Addressing the rate of expected erosion, the GEI report opined that the bluff would erode a total of approximately 10 feet in 75 years, based on an annual erosion rate of 0.125 feet.[3]  Addressing the issue of bluff stability to arrive at a safety factor of 1.5 as required by the City's LCP, the GEI report concluded that "the coastal bluff at the site is considered grossly stable against deep-seated failures with a setback of 18.3 feet."[4]  The

---

[3]    The GEI report acknowledged that for other portions of the Encinitas coast, GEI had used a historical bluff recession rate of 0.49 feet per year.  However, the report concluded that a recession rate of 0.49 was not warranted in this case because the bluff at issue was "much more stable than other areas to the north" and historical data from 1953 showed that the bluff at issue had not eroded significantly since that time.  If applied here, an erosion rate of 0.49 feet per year would result in erosion of 36.75 feet over 75 years.

[4]    The Commission's decision in this case contains a clear explanation of what is involved in performing a slope stability analysis to arrive at a safety factor of 1.5. "Assessing the stability of slopes against landsliding is undertaken through a quantitative

GEI report then *combined* the 10 feet of erosion expected over 75 years with the 18.3 foot setback needed to achieve a bluff stability safety factor of 1.5 to arrive at a total setback distance of 28.3 feet (rounded to 29 feet) for the construction on the Lot.[5] As the City's LCP provides that construction on coastal bluffs shall be set back a *minimum* of 40 feet (Encinitas Mun. Code, § 30.34.020B.1),[6] the GEI report concluded that based on its analysis showing a recommended setback of approximately 29 feet, "a 40-foot foundation

slope stability analysis. In such an analysis, the forces resisting a potential landslide are first determined. These are essentially the strength of the rocks or soils making up the bluff. Next, the forces driving a potential landslide are determined. These forces are the weight of the rocks as projected along a potential slide surface. The resisting forces are divided by the driving forces to determine the 'factor of safety.' A value below 1.0 is theoretically impossible, as the slope would have failed already. A value of 1.0 indicates that failure is imminent. Factors of safety at increasing values above 1.0 lend increasing confidence in the stability of the slope. The industry-standard for new development is a factor of safety of 1.5. A slope stability analysis is performed by testing hundreds of potential sliding surfaces. The surface with the minimum factor of safety will be the one on which failure is most likely to occur. Generally, as one moves back from the top edge of a slope, the factor of safety against landsliding increases. Therefore, to establish a safe setback for slope stability from the edge of a coastal bluff, one needs to find the distance from the bluff edge at which the factor of safety is at least equal to 1.5."

[5]    Specifically, the GEI report stated, "Bluff recession rates suggest a minimum setback of 10 feet from the bluff edge. We have assigned an additional 18.3 feet to accommodate surficial failure from bluff face deterioration. *When combined*, we would recommend a bluff setback of approximately 29 feet." (Italics added.) In later correspondence prior to the City's approval of the application, the authors of the GEI report made clear that they had combined the factors of erosion over 75 years *and* the required safety factor of 1.5 to arrive at their recommended setback: "We have confirmed the appropriate setback distance from the bluff edge with a 1.5 factor of safety plus 75 years of estimated erosion. . . . When combined we would recommend a bluff setback of 29 feet."

[6]    The City's LCP states that, with certain exceptions not applicable here, "no principal structure, accessory structure, facility or improvement shall be constructed, placed or installed within 40 feet of the top edge of the coastal bluff." (Encinitas Mun. Code, § 30.34.020.B.1.)

setback should allow for a project life of 75 years, without the need for toe-of-bluff protection."

The City's planning commission approved the application on May 2, 2013. As part of the approval, the planning commission made findings that the project is consistent with the City's LCP. As one of the conditions for the permit, the City required the Lindstroms to provide a letter stating that " 'the building as designed could be removed in the event of endangerment, and the property owner agreed to participate in any comprehensive plan adopted by the City to address coastal bluff recessions and shoreline erosion problems in the City.' "[7]

B.    *The Commission's Consideration of the Appeal*

In June 2013, the City's approval of the Lindstroms' coastal development permit was appealed to the Commission by two of the Commission's members.[8] As relevant here, one ground of the commissioners' appeals was that the City's approval "appears inconsistent with the policies of the LCP relating to the requirement that new

---

[7]    This condition was required pursuant to the portion of the City's LCP concerning the Coastal Bluff Overlay Zone, which states, "Any new construction shall be specifically designed and constructed such that it could be removed in the event of endangerment and the property owner shall agree to participate in any comprehensive plan adopted by the City to address coastal bluff recession and shoreline erosion problems in the City." (Encinitas Mun. Code, § 30.34.020B.1.a.)

[8]    The California Coastal Act of 1976 (Pub. Resources Code, § 30000, et seq.) (the Coastal Act) provides that for certain types of coastal development permits, the local government's decision may be appealed by, among others, any two members of the Commission. (*Id*., §§ 30603, subd. (a), 30625.)

7

development be sited in a safe location that will not require shoreline protection in the future."

On May 28, 2013, which was after the City's approval of the permit, but prior to the filing of the appeal by the two commissioners, the authors of the GEI report sent a letter to the Commission setting forth a revised geotechnical analysis, presumably for consideration during the commissioners' decision on whether to file an appeal.[9] The GEI letter stated that upon review of other materials, the authors concluded that the erosion rate of 0.125 per year was in error, and it set forth a revised erosion rate of 0.40 per year, for total erosion of 30 feet in 75 years. The GEI letter also revised the bluff stability analysis, concluding that a safety factor of 1.5 would be achieved at a setback of 42.25 feet from the edge (instead of 18.3 feet). GEI explained that if it combined the expected erosion of 30 feet over 75 years with the 42.25 foot setback required to achieve a safety factor of 1.5, the construction would have to be set back a total of 72.25 feet from the edge of the bluff. However, in the letter, GEI proposed an alternative to a bluff failure analysis that did not depend on achieving a safety factor of 1.5. Specifically, GEI proposed that a bluff stability analysis be based on the "natural angle of repose" of the materials making up the bluff. In that analysis, GEI concluded that a "9.7-foot angle of repose setback" was required in addition to the 30-foot setback required for the expected rate of erosion, for a total setback of 39.7 feet, which was less than the City's minimum 40-foot setback for bluff top construction.

---

[9] The letter states it is in response to a discussion with Commission staff members on May 9, 2013.

As the appeal proceeded in the Commission, the Lindstroms decided to obtain a different geotechnical report and requested that the Commission delay its decision on the appeal while the new report was being prepared. The new geotechnical report, dated October 23, 2015, was prepared by TerraCosta Consulting Group (TCG) and signed by two authors: a registered civil/geotechnical engineer and a certified engineering geologist.[10]

The TCG report concluded that the predicted bluff erosion rate was 0.40 per year, so that in 75 years the bluff could erode 30 feet. TCG explained that its erosion rate was based on "our review of documents and experience along this reach of the coastline," including "our in-house files, along with available published and unpublished documents." With respect to the bluff stability analysis, the TCG report concluded that the bluff was stable at a safety factor of 1.5 "between 23 and 25 feet from the top of [the] bluff."[11] However, TRG rejected the approach employed by GEI, in which the amount of erosion over 75 years *was added to* the setback required for a safety factor of 1.5 to arrive at the total required setback to ensure the continued stability, over 75 years, of the

---

[10]    The Lindstroms base their current arguments on the content of the TCG report and no longer advocate the approach set forth in the GEI report or the GEI letter.

[11]    The setback required for a slope stability safety factor of 1.5 ranges between 23 feet to 25 feet because of slightly differing bluff configurations in the two cross-sections examined by TCG.

9

structure to be constructed on the bluff.[12] Instead, TCG concluded that construction on the bluff would be safe at the end of 75 years *even if* it did *not* have a safety factor of 1.5 throughout the entire period:

> "If we were to now assume 30 feet of erosion essentially translating the existing coastal bluff profile to 30 feet landward . . . this would mean that in 75 years, the actual computed factor of safety 1 foot westerly of the 40-foot setback would be 1.29, and slightly greater when calculated at the existing 40-foot set back.

> "In our opinion, the proposed structure will be perfectly safe for at least 75 years, and will not require a seawall or other bluff stabilization structure during this time. Structures are stable as long as the factor of safety is 1.0 or greater. A 1.29 factor of safety implies a 29 percent safety margin against collapse. It is for this reason that the Coastal Commission does not typically approve seawalls unless the factor of safety at the structure is less than 1.2 and other instability factors are present. There is no engineering reason that a 75-year-old structure near the end of its useful life would be required to have a factor of safety in excess of 1.29 in order to be considered safe. For this reason, we certify without hesitation that the proposed structure will be reasonably safe from failure and erosion over its lifetime without having to propose any shore or bluff stabilization to protect the proposed structure in the future."

The Commission heard the appeal on July 13, 2016. The Commission's staff geologist Dr. Mark Johnsson made a presentation to the Commission at the hearing. Among other things, Johnsson did not take issue with TCG's analysis that a safety factor of 1.5 was achieved at a distance of 23 to 25 feet from the edge of the bluff. However, Johnsson disputed TCG's erosion rate of 0.40, as he believed "a more appropriate future erosion rate for this site is 0.49 feet per year, or 37 feet over 75 years" based on a 1999

---

12    Based on the erosion expected over 75 years and the setback required to achieve a safety factor of 1.5 as determined in the TCG report, if TCG had taken the approach of adding those two figures together, as GEI did, the required setback would be 53 to 55 feet from the edge of the bluff.

peer-reviewed FEMA funded study showing the highest long-term erosion rate in the area.[13] Johnsson further pointed out that "the city's certified LCP requires that not only must an adequate factor of safety of 1.5 be shown under present conditions, but it must also demonstrate an adequate factor of safety of 1.5 will be maintained over 75 years and cover all types of slope failure."[14] He explained that for "assuring an adequate factor of safety for the expected life of the development" it was necessary to calculate the total setback as "equal to the sum of the bluff retreat setback and the slope stability setbacks." Therefore, in Johnsson's opinion, the setback required in this instance was the 37 foot setback required to account for erosion over 75 years, plus the 23 to 25-foot setback required to achieve a safety factor of 1.5, for a total setback of 60 to 62 feet.

In the presentation made by the Lindstroms' counsel at the Commission hearing, counsel argued that the Commission should rely on the TCG report to approve the permit at a setback of 40 feet. According to counsel, the City's LCP did not state that a safety factor of 1.5 had to exist over the entire course of 75 years. Counsel argued that the City's LCP did not "require precise methodology" to determine that the structure would be stable over the course of 75 years, so that the TCG report provided a sufficient basis to determine, under the terms of the City's LCP, that a home constructed at a setback of 40

---

[13]    Johnsson explained that because of expected sea-level rise the predicted future erosion rate of 0.49 is based on the *highest* historic erosion rate shown in the 1999 study. We note that consistent with Johnsson's 0.49 erosion rate, GEI's original report noted that it had used a 0.49 erosion rate for other locations in Encinitas.

[14]    As we have explained, the GEI report also took the approach of demonstrating a safety factor of 1.5 over the course of 75 years, taking into account the effect of expected erosion over that time period.

feet would be stable over its lifetime and not require a seawall or other bluff stabilization device.

In its decision, the Commission explained, "In order to find the appropriate geologic setback for the bluff top home, the Certified LCP requires not only that a long-term erosion rate be adequately identified but also that the geotechnical report demonstrate an adequate factor of safety against slope failure (i.e., landsliding) of 1.5 will be maintained over 75 years (See [Encinitas Mun. Code, §] 30.34.020(D) . . .). The applicant's geotechnical report of October 23, 2015 identified that a 1.5 factor of safety under present conditions is located at approximately 23 to 25 ft. from the bluff edge. Thus, applying the estimated 37 ft. of erosion over the next 75 years to the 23 to 25 ft. location of the current 1.5 factor of safety would establish a minimum setback for new development at approximately 60 to 62 ft. (37 ft.+ (23 to 25 ft.)) from the coastal bluff." The Commission explained that the building footprint resulting from a 60 to 62 foot setback from the bluff edge would still allow the Lindstroms to construct a 3500 square foot home, not including a basement, and that if the Lindstroms obtained a variance from the City reducing the frontyard setback, the building footprint would be even larger.[15]

Rejecting the approach proposed in the TCG report, the Commission stated, "The applicant also contends that the new home, as proposed to be located 40 ft. from the bluff edge, is expected to result in a Factor of Safety of 1.29 after 75 years of erosion

---

[15] Further, the City's LCP permits a structure to include a cantilevered portion that extends beyond the footprint of the structure, which the Commission noted would allow that portion of the structure to extend seaward an additional 12 feet.

(assuming an erosion rate of 0.40 ft./yr.). The applicants argue that with a 1.29 Factor of Safety the home will be safe throughout its 75 year economic life and will not require protection from shoreline armoring. However, the LCP requires a Factor of Safety of 1.5 at 75 years. Thus the applicants' argument is not consistent with the requirements of the LCP. In addition, if the erosion rate recommended by the Commission geologist were used in the applicants' stability analysis, the resulting factor of safety would be significantly lower than 1.29 and after 75 years the home would most likely require shoreline armoring. The industry standard for new development is a Factor of Safety of 1.5. Therefore, to establish a safe setback from slope stability from the edge of a coastal bluff, a new home must be sufficiently set back from the bluff edge to ensure that the 1.5 Factor of Safety is maintained throughout the economic life of the structure."

The Commission therefore approved the coastal development permit, but with several conditions, including that the structure be set back 60 to 62 feet from the edge of the bluff.[16] Specifically, the conditions required by the Commission that are relevant to the issues presented in the Commission's appeal and the Lindstroms' cross-appeal are as follows:

> "[1.a]  The foundation of the proposed home and the proposed basement
> and shoring beams shall be located no less than 60 to 62 ft. feet landward of

---

[16]  On the date of the hearing, the Commission also made the preliminary determination that the appeal presented a substantial issue meriting full consideration of the appeal. (See Pub. Resources Code, § 30625, subd. (b)(2) [the Commission shall hear an appeal unless it determines "[w]ith respect to appeals to the commission after certification of a local coastal program, that no substantial issue exists with respect to the grounds on which an appeal has been filed"].)

13

the existing upper bluff edge on the northern and southern portions of the site, respectively. [¶] . . .

"[3.a]  By acceptance of this Permit, the applicants agree, on behalf of themselves and all successors and assigns, that no bluff or shoreline protective device(s) shall ever be constructed to protect the development approved pursuant to Coastal Development Permit No. A-6-ENC-13-0210 including, but not limited to, the residence and foundation in the event that the development is threatened with damage or destruction from waves, erosion, storm conditions, bluff retreat, landslides, or other natural hazards in the future.  By acceptance of this Permit, the applicants hereby waive, on behalf of themselves and all successors and assigns, any rights to construct such devices that may exist under Public Resources Code Section 30235.

"[3.b] By acceptance of this Permit, the applicants further agree, on behalf of themselves and all successors and assigns, that the landowner shall remove the development authorized by this Permit, including the residence and foundation, if any government agency has ordered that the structures are not to be occupied due to any of the hazards identified above.  In the event that portions of the development fall to the beach before they are removed, the landowner shall remove all recoverable debris associated with the development from the beach and ocean and lawfully dispose of the material in an approved disposal site.  Such removal shall require a coastal development permit."

"[3.c] In the event the edge of the bluff recedes to within 10 feet of the principal residence but no government agency has ordered that the structures not be occupied, a geotechnical investigation shall be prepared by a licensed coastal engineer and geologist retained by the applicants, that addresses whether any portions of the residence are threatened by wave, erosion, storm conditions, or other natural hazards.  The report shall identify all those immediate or potential future measures that could stabilize the principal residence without shore or bluff protection, including but not limited to removal or relocation of portions of the residence.  The report shall be submitted to the Executive Director and the appropriate local government official.  If the geotechnical report concludes that the residence or any portion of the residence is unsafe for occupancy, the permittee shall, within 90 days of submitting the report, apply for a coastal development permit amendment to remedy the hazard, which shall include removal of the threatened portion of the structure.

C.      *The Trial Court's Decision on the Petition for Writ of Mandate*

14

In August 2016, the Lindstroms filed a petition for writ of mandate against the Commission in the trial court. The writ of mandate challenged several of the special conditions imposed by the Commission, including special conditions 1.a, 3.a, 3.b, and 3.c set forth above.[17]

After considering the administrative record and the parties' arguments, the trial court partially granted the relief sought by the Lindstroms.

First, the trial court ruled that the Commission abused its discretion in requiring a setback of 60 to 62 feet from the bluff edge in special condition 1.a. The trial court explained that a setback of that distance was not required by the City's LCP, and that the imposition of the condition was not supported by substantial evidence because it was not based on a report prepared by a certified engineering geologist, but by staff geologist Johnsson's presentation to the Commission.

In concluding that the City's LCP did not require a setback of 60 to 62 feet, the trial court relied primarily on a letter included by the Lindstroms in the administrative record that provided evidence of the City's interpretation of its LCP in 2006 when corresponding with the Commission about two other applications for coastal development permits. That letter, written by a city planner, stated that the City interpreted its LCP as follows: "The current practice for determining bluff setback accepted by the City of Encinitas requires that the geotechnical consultants perform two separate calculations to

_____

[17] The petition for writ of mandate also challenged other special conditions that are not at issue in this appeal and which were not pursued in the Lindstroms' trial court briefing.

15

determine the appropriate bluff setback. First, the consultant is to determine the amount of erosion, based upon current published and accepted studies that will take place in 75 years. Secondly, the geotechnical consultant, based upon site specific testing, is to perform a slope stability analysis and determine a setback distance that defines a 1.5 safety factor for the slope. *The larger of the two setback determinations is then utilized as the minimum required bluff setback*; in no case can the bluff setback be less than 40 feet." (Italics added.) The trial court concluded that contrary to the Commission's interpretation, the City's LCP did not require that the total required setback be determined *by adding together* the amount the bluff was expected to recede over 75 years due to erosion to the setback required to achieve a safety factor of 1.5.

Second, the trial court concluded that the Commission abused its discretion in imposing special condition 3.a, which requires the Lindstroms to waive any right to build a bluff or shoreline protective device, such as a seawall, in the future. The trial court explained that the requirement was contrary to the language of the City's LCP and the Coastal Act because neither of them "contain such a waiver."

Finally, the trial court approved both special condition 3.b, which requires removal of the residence and foundation if a government agency orders the structures are not to be occupied due to a natural hazard; and special condition 3.c, which requires the Lindstroms to obtain and follow the recommendations in a geotechnical report if the bluff recedes to within 10 feet of the principal residence. The trial court concluded that the special conditions were permissible because they were not inconsistent with the LCP.

D.     *The Instant Appeal and Cross-Appeal*

16

The Commission filed a notice of appeal from the trial court's judgment and the Lindstroms filed a cross-appeal. The Commission contends that the trial court erred with respect to special conditions 1.a and 3.a. The Lindstroms contend the trial court erred with respect to special conditions 3.b and 3.c.

II.

DISCUSSION

A.      *Statutory Background and Standard of Review*

"The Coastal Act 'was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California. The Legislature found that "the California coastal zone is a distinct and valuable natural resource of vital and enduring interest to all the people"; that "the permanent protection of the state's natural and scenic resources is a paramount concern"; that "it is necessary to protect the ecological balance of the coastal zone" and that "existing developed uses, and future developments that are carefully planned and developed consistent with the policies of this division, are essential to the economic and social well-being of the people of this state. . . ." ([Pub. Resources Code,] § 30001, subds. (a) and (d).)' [Citation] The Coastal Act is to be 'liberally construed to accomplish its purposes and objectives.' (Pub. Resources Code, § 30009.)" (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 793-794 (*Pacific Palisades*).)

"The Coastal Act expressly recognizes the need to 'rely heavily' on local government '[t]o achieve maximum responsiveness to local conditions, accountability, and public accessibility. . . .' (Pub. Resources Code, § 30004, subd. (a).) As relevant

17

here, it requires local governments to develop [LCPs], comprised of a land use plan and a set of implementing ordinances designed to promote the act's objectives of protecting the coastline and its resources and of maximizing public access." (*Pacific Palisades*, *supra*, 55 Cal.4th at p. 794.) "The Coastal Act provides that a local government must submit its [land use plan] to the [Commission] for certification that the [land use plan] is consistent with the policies and requirements of the Coastal Act. ([Pub. Resources Code,] §§ 30512, 30512.2.) After the Commission certifies a local government's [land use plan], it delegates authority over coastal development permits to the local government. (*Pacific Palisades*, at p. 794, citing [Pub. Resources Code,] §§ 30519, subd. (a), 30600.5, subds. (a), (b), (c).)" (*Beach & Bluff Conservancy v. City of Solana Beach* (2018) 28 Cal.App.5th 244, 252 (*Beach & Bluff Conservancy*).)

After a local government grants a coastal development permit, certain types of permit decisions may be appealed to the Commission by the applicant, any aggrieved person, or two members of the Coastal Commission (Pub. Resources Code, §§ 30603, 30625, subd. (a)). As relevant here, an appeal to the Commission is authorized for "[d]evelopments approved by the local government between the sea and the first public road paralleling the sea or within 300 feet of the inland extent of any beach or of the mean high tideline of the sea where there is no beach, whichever is the greater distance." (*Id.*, § 30603, subd. (a)(1).) " 'If the Commission determines that an appeal presents a substantial issue, the permit application is reviewed de novo; in effect, the Commission hears the application as if no local governmental unit was previously involved, deciding for itself whether the proposed project satisfies legal standards and requirements.' "

18

(*McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 920, fn. 3; see also Pub. Resources Code, §§ 30621 [de novo hearing on appeal]; 30625, subd. (b)(2) [substantial issue required].)  The Commission's jurisdiction on appeal, however, is limited.  (*Schneider v. California Coastal Com.* (2006) 140 Cal.App.4th 1339, 1344 (*Schneider*).)  Specifically, "[t]he grounds for an appeal . . . shall be limited to an allegation that the development does not conform to the standards set forth in the certified local coastal program or the public access policies set forth in [the Coastal Act]."  (Pub. Resources Code, § 30603, subd. (b)(1).)[18]  In addition, the Commission's jurisdiction on appeal includes imposing reasonable terms and conditions on the permit, as the Coastal Act provides "[a]ny permit that is . . . approved on appeal,  . . . shall be subject to reasonable terms and conditions in order to ensure that such development or action will be in accordance with the provisions of this division."  (Pub. Resources Code, § 30607.)

As our Supreme Court has observed, " '[u]nder the Coastal Act's legislative scheme, . . .  the [LCPs] and the development permits issued by local agencies pursuant to the Coastal Act are not solely a matter of local law, but embody state policy.' [Citation] 'In fact, a fundamental purpose of the Coastal Act is to ensure that state policies prevail over the concerns of local government.' "  (*Pacific Palisades*, *supra*, 55 Cal.4th at p. 794.)

---

[18]  The Coastal Act's right of public access is set forth, *inter alia*, in Public Resources Code, section 30211, which states that "[d]evelopment shall not interfere with the public's right of access to the sea where acquired through use or legislative authorization" and section 30212, subdivision (a), which states that with certain exceptions, "[p]ublic access from the nearest public roadway to the shoreline and along the coast shall be provided in new development projects."  The public access policies of the Coastal Act are not at issue in this appeal.

To obtain judicial review of a decision or action of the Commission, any aggrieved person has the right to file a petition for writ of mandate pursuant to section 1094.5 of the Code of Civil Procedure. (Pub. Resources Code, § 30801.) " ' "The inquiry in such a case shall extend to the questions of whether the [Commission] has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion.' " [Citation] An abuse of discretion is established if the Commission failed to proceed in the manner required by law, its order or decision is not supported by the findings, or its findings are not supported by substantial evidence. [Citation] [¶] The trial court presumes that the agency's decision is supported by substantial evidence, and the party challenging that decision bears the burden of demonstrating the contrary. [Citation] In reviewing the agency's decision, the court examines the whole record and considers all relevant evidence, including that evidence which detracts from its decision. [Citation.] 'Although this task involves some weighing to fairly estimate the worth of the evidence, that limited weighing does not constitute independent review where the court substitutes its own findings and inferences for that of the Commission. Rather, it is for the Commission to weigh the preponderance of conflicting evidence, as [the court] may reverse its decision only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it.' " (*Ocean Harbor House Homeowners Assn. v. California Coastal Com.* (2008) 163 Cal.App.4th 215, 226-227 (*Ocean Harbor*).)

"On appeal . . . our role is identical to that of the trial court." (*Ocean Harbor*, *supra*, 163 Cal.App.4th at p. 227.) " 'Thus, the conclusions of the superior court, and its

20

disposition of the issues in this case, are not conclusive on appeal.' " (*Eskeland v. City of Del Mar* (2014) 224 Cal.App.4th 936, 941.)

B.  *The Commission Did Not Abuse Its Discretion By Imposing Special Condition 1.a, Which Requires the Structure to Be Set Back 60 to 62 Feet from the Bluff Edge*

We first consider the Commission's challenge to the trial court's conclusion that the Commission abused its discretion by imposing special condition 1.a, which requires a 60 to 62-foot setback from the edge of the bluff. As we have explained, the Commission concluded that to meet the requirement in the City's LCP that the proposed structure be safe from bluff failure and erosion over the course of 75 years using a safety factor of 1.5, the Lindstroms' house had to be set back 60 to 62 feet from the bluff edge.

As they did in the trial court, the Lindstroms contend that the Commission abused its discretion because the City's LCP does not require the method applied by the Commission in determining the required setback. Specifically, the Lindstroms contend that the City's LCP requires only that the structure will be reasonably safe over its lifetime, not that the structure be set back a total distance determined by combining the setback required by 75 years of predicted erosion with the setback required to achieve a safety factor of 1.5. The Lindstroms contend that "the Commission advances a strained interpretation of the LCP as requiring the two distances (i.e., the 75-year erosion line and the 1.5 factor of safety line) to be added together to reach the required setback."[19]

---

[19]    The Lindstroms attempt to characterize their dispute with the Commission's interpretation of the City's LCP as a claim that "the Commission exceeded its jurisdiction by applying an incorrect legal interpretation of the City's certified LCP." We disagree

21

"The construction of an ordinance is a pure question of law for the court, and the rules applying to construction of statutes apply equally to ordinances." (*H.N. & Frances C. Berger Foundation v. City of Escondido* (2005) 127 Cal.App.4th 1, 12.) "Where, as here, the issue presented is one of statutory construction, our fundamental task is 'to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' [Citations] We begin by examining the statutory language because it generally is the most reliable indicator of legislative intent. [Citation] We give the language its usual and ordinary meaning, and '[i]f there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs.' [Citation] . . . Ultimately we choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting rather than defeating the general purpose of the statute. [Citation] Any interpretation that would lead to absurd consequences is to be avoided." (*Allen v. Sully-Miller Contracting Co.* (2002) 28 Cal.4th 222, 227.)

Before turning to the interpretation of the City's LCP, we note that the parties disagree as to whether the Commission's interpretation of the City's LCP is entitled to deference. "An agency interpretation of the meaning and legal effect of a statute is entitled to consideration and respect by the courts," although the agency's "power to

with the characterization. Even were the Commission's interpretation of the City's LCP ultimately determined to be erroneous, it is fully within the jurisdiction of the Commission on appeal to interpret and apply the requirements of a local government's LCP in carrying out its role of determining whether "the development does not conform to the standards set forth in the certified local coastal program." (Pub. Resources Code, § 30603, subd. (b)(1).

22

persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 (*Yamaha*).)[20]

Applying this rule, the Lindstroms contend that the City's planning commission is the applicable agency in this instance and that we should defer to it in interpreting the LCP because the City's planning commission applies the LCP when acting on coastal development permits. Specifically, the Lindstroms advocate that we look to the interpretation set forth in the 2006 letter that a city planner sent to the Commission, which purported to describe the City's approach, at the time, to determining required bluff-top setbacks under its LCP.[21]

---

[20]    "Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court. Depending on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth." (*Yamaha*, *supra*, 19 Cal.4th at pp. 7-8.) "Whether judicial deference to an agency's interpretation is appropriate and, if so, its extent—the 'weight' it should be given—is . . . fundamentally *situational*. A court assessing the value of an interpretation must consider a complex of factors material to the substantive legal issue before it, the particular agency offering the interpretation, and the comparative weight the factors ought in reason to command." (*Id*. at p. 12.)

[21]    We note however, that the record does not contain any official statement of the City's current interpretation of its LCP regarding bluff-top setbacks, and it is possible that the City's view has changed since 2006. Significantly, the GEI report submitted to the City with the Lindstroms' application for a coastal development permit employed the *same* methodology that the Commission believes is required by the City's LCP, in that it *combined* the setback required by the expected bluff erosion over 75 years with the setback required to achieve a safety factor of 1.5. The City approved the application and made no comment either endorsing or disapproving the particular methodology used by GEI. Further, the City is not a participant in this appeal, and it has taken no position on whether it would approve a 40 foot setback based on TRG's new calculations for the 75-year erosion setback and the safety factor setback. The only indication in the record that

23

In contrast, the Commission argues that we should defer to its interpretation of the City's LCP, as it was involved in certifying it, and it applies the City's LCP in reviewing appeals from the City's approval of coastal development permits.  Further, as the Commission points out, published case law states that a court should defer to the Commission's interpretation of a local government's LCP.  (*Alberstone v. California Coastal Com.* (2008) 169 Cal.App.4th 859, 864 ["we grant broad deference to the Commission's interpretation of the [Malibu] LCP since it is well established that great weight must be given to the administrative construction of those charged with the enforcement and interpretation of a statute"]; *Hines v. California Coastal Com.* (2010) 186 Cal.App.4th 830, 849 ["we grant broad deference to the Commission's interpretation of the [Sonoma County LCP] since it is well established that great weight must be given to the administrative construction of those charged with the enforcement and interpretation of a statute."]; *Reddell v. California Coastal Com.* (2009) 180 Cal.App.4th 956, 968 [in disagreement with project applicant as to whether building height and setbacks should be calculated using the city's general laws or the city's LCP, "we must defer to the Commission's interpretation because it is reasonable and in keeping with the purposes of the LCP"].)  We note, however, that those cases have limited persuasive value here because they did not involve a purported *disagreement* between the

the City may possibly still adhere to the interpretation in the 2006 letter is an email from the City's outside geotechnical consultant in February 2013, to someone at GEI, restating the position that the city planner expressed in the 2006 letter.  Thus, it is possible that, had the City been presented with the TCG report rather than the GEI report it would not have approved a 40 foot setback and would have required an analysis that combined the erosion setback and the safety factor setback.

24

Commission and the local government as to how the local government's LCP should be interpreted, and thus did not decide which, if any, interpretation should be given deference in the case of a conflict.[22]

Here, as we will explain, because the meaning of the relevant provisions of the City's LCP is plain, we need not resolve the issue of whether it is more appropriate to defer to the Commission or the City when interpreting the City's LCP, or what degree of deference, if any, would be appropriate. (*Sustainability, Parks, Recycling & Wildlife Defense Fund v. Department of Resources Recycling & Recovery* (2019) 34 Cal.App.5th 676, 701, citation omitted ["While in exercising our independent judgment regarding the construction of a statute we may give deference to an agency's interpretation . . . , no such deference is required here given the plain language of the statute.].)

---

[22] The Lindstroms contend that we also should not defer to the Commission's interpretation of the City's LCP because the Commission "interpreted and applied [the LCP] in the exact same manner as the City for many years." However, the record does not support the Lindstroms' contention. As the Commission points out, the record contains documents from as far back as 2002 showing that the Commission interpreted the City's LCP in the same manner as in this case. The Lindstroms have not identified any document in the record in which the Commission applied the interpretation of the LCP that the City advanced in the 2006 letter. Although the Lindstroms claim that "between 1995 and 2001, the Commission either expressly or tacitly approved [permits] for sixteen blufftop homes in Encinitas, all with a 40-foot setback," they do not cite to documents in the record to establish that assertion other than an unhelpful summary chart prepared by the Lindstroms for the Commission hearing that is not accompanied by any supporting record citations. Further, even if the Lindstroms were able to show that several homes with 40-foot setbacks were approved by the Commission between 1995 and 2001, they have not established that in evaluating the appropriate setbacks in those cases the Commission used a methodology different than it applied here. It is quite possible that in those cases the combination of the 75-year erosion setback and the safety factor setback did not exceed 40 feet.

With the rules of statutory interpretation in mind, we turn to the relevant language of the City's LCP. As we have explained, the LCP lists a number of issues that a geotechnical report in support of a coastal development permit in the Coastal Bluff Overlay Zone must address including the "potential landslide conditions," "estimated rate of erosion at the base of the bluff fronting the subject site," and "[a]ny other factors that might affect slope stability." (Encinitas Mun. Code, § 30.34.020D.4, 8 & 11.) The LCP also specifically requires the applicant to submit "a bluff slope failure plane analysis" which "shall be performed according to geotechnical engineering standards, and shall: [¶] a. Cover all types of slope failure. [¶] b. Demonstrate a safety factor against slope failure of 1.5. [¶] c. Address a time period of analysis of 75 years." (Encinitas Mun. Code, § 30.34.020D.11, 1st par. a-c.) However, the *general* standard that the applicant is required to meet is set forth as follows: "The review/report shall certify that the development proposed will have no adverse [e]ffect on the stability of the bluff, will not endanger life or property, and *that any proposed structure or facility is expected to be reasonably safe from failure and erosion over its lifetime without having to propose any shore or bluff stabilization to protect the structure in the future*." (Encinitas Mun. Code, § 30.34.020D, italics added.)

The foregoing provisions establish several principles. First, a structure must be reasonably safe from both "failure *and* erosion" over its lifetime. (Encinitas Mun. Code, § 30.34.020D, italics added.) Second, an analysis of bluff slope failure must demonstrate a "safety factor against slope failure of 1.5." (Encinitas Mun. Code, § 30.34.020D.11, 1st

26

par. b.)[23]  Third, the designated lifetime of a structure, over which safety from failure *and* erosion must be demonstrated, is 75 years.  (Encinitas Mun. Code, § 30.34.020D.11, 1st par. c [requiring "a time period of analysis of 75 years"].)  Finally, the safety from failure and erosion must be obtained "without having to propose any shore or bluff stabilization to protect the structure in the future."  (*Ibid.*)

The Lindstroms contend that the provisions of the LCP we have quoted above "require[] applicants to submit a geotechnical review or report that certifies simply that the structure be '*reasonably safe* from failure and erosion over its lifetime,' not that a 1.5 factor of safety will be absolutely *maintained* over a period of 75 years."  According to the Lindstroms, "[t]he Commission's interpretation would require applicants to determine a bluff edge setback by adding the distance from bluff edge to the 1.5 factor of safety line to the distance from the bluff edge to the 75-year erosion line, resulting in a far greater setback distance than the LCP's requirement that the 'development proposed will have no adverse effect on the stability of the bluff, will not endanger life or property, and that any proposed structure . . . is expected to be reasonably safe from failure and erosion over its lifetime without having to propose any shore or bluff stabilization to protect the structure in the future.' [Citation]  That is not a correct, or even reasonable, interpretation of the LCP."  As the Lindstroms interpret the LCP, "the plain language" "does not require the engineer to certify a 1.5 factor of safety through the entire 75 years."  As we will explain, we disagree.

---

[23]    The parties agree that a safety factor of 1.5 is the industry standard for new construction on slopes.

Importantly, the LCP requires a structure to "be reasonably safe from failure *and* erosion over its lifetime." (Encinitas Mun. Code, § 30.34.020D, italics added.) Further, the LCP specifically provides that the geotechnical report must "[d]emonstrate a safety factor against slope failure of 1.5" and must "[a]ddress a time period of analysis of 75 years." (Encinitas Mun. Code, § 30.34.020D.11, 1st par. b & c.) When read together, the plain meaning of these provisions is that, taking into account the erosion that will occur over 75 years, the geotechnical report must demonstrate a safety factor of 1.5 at the end of 75 years. The Lindstroms' proposed interpretation, in which a safety factor of 1.5 must be shown only *at the present time*, not taking into account predicted erosion over the lifetime of the structure, defies the plain language of the LCP as well as common sense. A layman does not need special geotechnical training to understand the self-evident concept that for a structure to "be reasonably safe from failure and erosion over its lifetime" (Encinitas Mun. Code, § 30.34.020D), the *combined effect* of expected erosion and bluff instability must be considered.[24] A structure that is reasonably safe *today*

_____

[24] The Lindstroms contend that Johnsson's approach of combining the 75-year erosion setback with the safety factor setback should not have been followed by the Commission because that methodology "has not been peer reviewed and is not generally accepted by the geotechnical engineering community." We reject the argument for two reasons. First, the Lindstroms support their argument with a statement by TCG's engineer, Walter Crampton, who spoke at the Commission hearing. Crampton stated, "With regards to Dr. Johnsson's approach, I frankly disagree with it. And an important thing, it's not generally accepted by the technical community. It's not been peer reviewed by the geotechnical community." However, Crampton was ambiguous as to what he was referencing in criticizing Johnsson's approach, and in context it appears he may have been criticizing Johnsson's approach to determining the predicted rate of erosion. Specifically, in Crampton's next sentence he describes a paper he wrote "to address the effects of sea level rise on coastal bluff erosion." Second, although Johnsson read the

because it is located 40 feet from the edge of the bluff will not be reasonably safe *at the end of its lifetime* when the bluff has eroded 37 feet, meaning that the structure is only three feet from the edge of the bluff.[25]

The TCG report contended that a structure that was set back 40 feet from the bluff edge would be reasonably safe after 75 years *with a safety factor of 1.29.*[26] However,

---

City's LCP as requiring that the 75-year erosion setback be combined with the safety factor setback, that understanding does not depend on any special geotechnical conclusion that requires peer review but is, instead, a matter of statutory interpretation. As we have explained, the plain language of the LCP requires that a safety factor of 1.5 be demonstrated over the course of 75 years.

[25]     The predicted erosion of 37 feet over 75 years is based on Johnsson's presentation to the Commission, which assumed an annual erosion rate of 0.49 feet premised on the greatest rate of historical erosion identified in a 1999 peer-reviewed study. Even were we to employ TCG's assumption that the bluff will erode only 30 feet over 75 years (at an annual rate of 0.40 feet), at the end of 75 years, a structure built with a 40-foot setback would be only 10 feet from the bluff edge, which is far less than the 23 to 25 feet of setback that TCG concluded was necessary to achieve a safety factor of 1.5. On appeal, although the Lindstroms do not directly challenge the 0.49-foot annual rate of erosion identified by Johnsson, they generally attempt to discredit Johnsson by pointing out that the City's LCP requires a report prepared by "a certified engineering geologist who has been pre-qualified as knowledgeable in City standards, coastal engineering and engineering geology." (Encinitas Mun. Code, § 30.34.020D.) In the trial court, the Lindstroms argued that Johnsson was a "staff geologist, who had no training as an engineer, neither civil nor geotechnical." In their appellate brief, the Lindstroms argue that Johnsson should not have been credited because he "is not a geotechnical engineer" and "did not perform *any* independent analysis of the project" and instead "simply reviewed the reports submitted by the Lindstroms' consultants." We are not persuaded that the Commission improperly relied on Johnsson's opinion. For one thing, a document in the record indicates that Johnsson identifies himself as a certified engineering geologist (i.e., "C.E.G,"), which is the exact qualification required by the City's LCP. Further, Johnsson amply supported his opinions, including explaining that his decision to use an annual erosion rate of 0.49-feet was based on a published peer-reviewed study regarding the Encinitas coast, which he specifically identified.

29

based on the plain language of the City's LCP, a safety factor of 1.29 does not meet bluff stability requirements. Rather than leaving open for debate the issue of what constitutes a structure that is reasonably safe from failure, the City's LCP *expressly states* that the geotechnical report must "[d]emonstrate a safety factor against slope failure of 1.5." (Encinitas Mun. Code, § 30.34.020D.11, 1st par. b.) In light of that language, the Commission reasonably concluded that, even accepting all of TCG's underlying assumptions, the TCG report simply did not meet the requirements set forth in the LCP because TCG acknowledged that the safety factor at the end of 75 years would be 1.29, not 1.5.[27]

We therefore conclude that the trial court erred in granting relief to the Lindstroms on special condition 1.a. The Commission did not abuse its discretion by requiring that the Lindstroms' house be set back 60 to 62 feet from the edge of the bluff.

C.    *The Commission Did Not Abuse Its Discretion By Requiring in Special Condition 3.a That the Lindstroms Waive Any Right to Build a Seawall or Other Bluff Protection Device*

_____

[26]    We note that if, as Johnsson opined, the annual rate of erosion is assumed to be 0.49 rather than 0.40 as determined by TCG, the safety factor would be *less* than 1.29 at the end of 75 years.

[27]    The Lindstroms contend that the Commission is improperly attempting to amend the City's LCP by interpreting it as requiring a setback combining the 75-year erosion setback and the safety factor of 1.5 setback. As the Lindstroms correctly point out, after an LCP is certified, the Commission may not unilaterally amend a local government's LCP and is limited to *recommending* that the local government adopt certain amendments. (Pub. Resources Code, §§ 30514, 30519, 30519.5; *City of Malibu v. California Coastal Com.* (2012) 206 Cal.App.4th 549, 563; *Security National Guaranty, Inc. v. California Coastal Com.* (2008) 159 Cal.App.4th 402, 421-422.) However, because we conclude that the Commission's interpretation is supported by the plain language of the City's LCP, its interpretation does not effect an amendment to the LCP.

We next consider the Commission's challenge to the trial court's ruling that the Commission abused its discretion in imposing special condition 3.a, which requires the Lindstroms to agree that "no bluff or shoreline protective device(s) shall ever be constructed to protect the development approved pursuant to" the permit and to "waive, on behalf of themselves and all successors and assigns, any rights to construct such devices that may exist under Public Resources Code Section 30235."[28] The Commission argues that it has the authority to impose reasonable special conditions when making a de novo decision on a coastal development permit. The Lindstroms, in contrast, argue (1) the City's LCP does not allow the imposition of a requirement that the Lindstroms waive any future right to build a seawall; and (2) the imposition of special condition 3.a is an unconstitutional taking without compensation.

1.    *The Commission's Authority to Impose Special Conditions*

In considering the Lindstroms' contention that the City's LCP does not authorize the Commission to impose special condition 3.a, we begin with the provision in the Coastal Act that authorizes the Commission to impose reasonable terms and conditions on any permit that it approves on appeal to ensure that the development is in accordance with the Coastal Act's provisions. Specifically, the Coastal Act provides that "[a]ny permit that is issued or any development or action *approved on appeal*, pursuant to this chapter, shall be subject to reasonable terms and conditions in order to ensure that such

---

28    For the sake of convenience, we will use the shorthand term "seawall" to refer to all types of bluff or shoreline protective devices at issue in special condition 3.a.

development or action will be in accordance with the provisions of this division." (Pub. Resources Code, § 30607, italics added.)

Much of the case law discussing the Commission's broad authority to impose permit conditions has arisen in cases where the permit application was made directly to the Commission rather than where the Commission was considering an appeal from a local government's issuance of a permit. (*Ocean Harbor*, *supra*, 163 Cal.App.4th at p. 242 [in a case arising after the Commission approved an application for a permit to build a seawall made to the Commission, but imposing mitigation-related conditions, the court observed that the Commission has "broad discretion" to impose conditions in granting the permit]; *La Costa Beach Homeowners' Assn. v. California Coastal Com.* (2002) 101 Cal.App.4th 804, 817 [approving the Commission's imposition of offsite mitigation as a condition for a permit application made directly to the Commission]; *Whaler's Village Club v. California Coastal Com.* (1985) 173 Cal.App.3d 240, 261 [in a direct application to the Commission for a revetment permit, the imposition of a condition requiring dedication of an easement for public access was within the Commission's authority]; *Liberty v. California Coastal Com.* (1980) 113 Cal.App.3d 491, 498 [in a challenge to the Commission's imposition of parking condition to a development permit made directly to the Commission, the court observed that the Commission "can impose reasonable terms and conditions in order to ensure a development will be in accordance with the provisions of the law"].)

The central authority considering the Commission's authority to impose special conditions when deciding *an appeal* from a local government's approval of a coastal

32

development permit is *Schneider*, *supra*, 140 Cal.App.4th 1339.  In *Schneider*, on the Commission's de novo review of a local government's approval of a permit to build a coastal residence, the Commission imposed 15 special conditions, several of which were targeted at preserving the character of the view that a boater would have of the coastline from offshore.  (*Id*. at pp. 1342-1343.)  Although *Schneider* did not question the Commission's authority to impose special conditions on appeal, it required that those conditions be consistent with the Coastal Act and the local government's LCP.  (*Id*. at pp. 1345-1348.)  Because neither of those bodies of law contained a basis for protecting a boater's right to a view of the coastline from offshore, *Schneider* held that the Commission exceeded its authority in imposing those special conditions.  (*Id*. at p. 1348)

      2.       *Special Condition 3.a is Consistent With the City's LCP*

According to the Lindstroms, the Commission's requirement that they waive any future right they might have to build a seawall is impermissible because it "directly contradicts the express language of the LCP, which allows for bluff repair and erosion control measures when necessary to protect existing principal structures in danger from erosion."  Specifically, the City's Resource Management Element of the General Plan, Policy 8.5 provides, "Construction of structures for bluff protection shall only be permitted *when an existing principal structure is endangered* and no other means of protection of that structure is possible."  (Encinitas General Plan and Local Coastal Program Land Use Plan, Resource Management Element, Policy 8.5 (Policy 8.5), italics

33

added.)[29]  The Coastal Act contains a similar provision.  "Revetments, breakwaters, groins, harbor channels, seawalls, cliff retaining walls, and other such construction that alters natural shoreline processes shall be permitted when required to serve coastal-dependent uses or *to protect existing structures* or public beaches in danger from erosion and when designed to eliminate or mitigate adverse impacts on local shoreline sand supply."  (Pub. Resources Code, § 30235, italics added.)  In essence, the Lindstroms argue that after their home is built, it will become an "existing principal structure" covered by Policy 8.5, which permits a seawall if the structure becomes endangered.  Therefore, according to the Lindstroms, the Commission's imposition of special condition 3.a conflicts with Policy 8.5 and with the Coastal Act's provision allowing seawalls "when required . . . to protect existing structures."  (Pub. Resources Code, § 30235.)

However, as the Commission points out, special condition 3.a implements a *different* provision in the City's LCP, which is directly applicable here because it pertains to the construction of *new development on ocean bluffs*.  Specifically, the City's LCP states that a geotechnical report in support of a coastal development permit in the Coastal Bluff Overlay Zone must demonstrate "that any *proposed* structure or facility is expected to be reasonably safe from failure and erosion over its lifetime *without having to propose any shore or bluff stabilization to protect the structure in the future*."  (Encinitas Mun.

---

29    Similarly, the Public Safety Element of the City's General Plan states that bluff repair and erosion control measures "shall be permitted only when required to serve coastal-dependent uses or *to protect existing principal structures* or public beaches in danger from erosion."  (Encinitas General Plan and Local Coastal Program Land Use Plan, Public Safety Element, Policy 1.6(e), italics added.)

Code, § 30.34.020D, italics added.)[30] This provision in the City's LCP is similar to the Coastal Act's requirement that "[*n*]*ew development* shall . . . [¶] (b) Assure stability and structural integrity, and neither create nor contribute significantly to erosion, geologic instability, or destruction of the site or surrounding area or *in any way require the construction of protective devices that would substantially alter natural landforms along bluffs and cliffs*." (Pub. Resources Code, § 30253, italics added.)

The Commission explains that it "imposed the condition in order to harmonize the sections of the LCP addressing new development, which must in no way require a shoreline protective device[], and existing development, which may be entitled to such a device." Specifically, the Commission states that "[i]n order to avoid 'new' construction from arguably being considered 'existing' and thereby circumventing the LCP's restriction on shoreline devices, the Commission included special condition 3(a)."

Focusing on the portion of the City's LCP identified by the Commission pertaining to new development, we conclude that special condition 3.a is fully consistent with the City's LCP. The City's LCP establishes that new development may be approved only if "*over its lifetime*" the new development is not expected to require a "*future"* proposal to build "*any shore or bluff stabilization to protect the structure*." (Encinitas Mun. Code, § 30.34.020D, italics added.) By requiring the Lindstroms to agree that no seawall will

---

30      The Public Safety Element of the City's General Plan similarly states that "[t]he City will rely on the Coastal Bluff . . . Overlay Zone[] to prevent future development or redevelopment . . . which may require structural measures to prevent destructive erosion or collapse." (Encinitas General Plan and Local Coastal Program Land Use Plan, Public Safety Element, Policy 1.3.)

ever be built to protect the home they propose to construct, special condition 3.a simply enforces the LCP's requirements for *new* development.[31]

      3.      *Special Condition 3.a Does Not Constitute an Unconstitutional Taking*

The Lindstroms also contend that special condition 3.a is impermissible because it constitutes an unconstitutional taking under the takings clause of the Fifth Amendment of the United States Constitution. "The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth, [citation], provides that private property

---

[31]    The Lindstroms' appellate brief contains extensive discussion aimed at rebutting a statutory argument that they perceive the Commission to have made in its opening brief. As the Lindstroms characterize the Commission's position, it believes that Public Resources Code, section 30235 allows construction of sea walls or other protective devices *only for* structures that were " 'existing' " at the time the Coastal Act took effect in 1977. However, the Commission's reply brief clarifies that it is not taking such a position. Instead, the Commission states that regardless of the definition of "existing" in Public Resources Code, section 30235, "it is entitled to impose the condition requiring [the Lindstroms] to waive any rights to build a seawall in the future *as a condition of approving their new development*." The Lindstroms have filed a respondents' appendix in support of their cross-appeal, which contains several documents that the Lindstroms contend are relevant to rebutting their perceived, but incorrect, understanding of the Commission's statutory interpretation argument. Specifically, the documents consist of (1) the original text of the Coastal Act; (2) the Commission's brief and the opinion in an unpublished 2006 appellate case; (3) the text of an unpassed 2017 Assembly bill. The Commission argues that all of the documents in the respondents' appendix are improperly included in the record, as they were not part of the administrative record (*Bunnett v. Regents of University of California* (1995) 35 Cal.App.4th 843, 853), and to the extent any of the documents may be subject to judicial notice to assist in statutory interpretation, the Lindstroms have not filed a request for judicial notice. The Commission contends that we should strike the respondents' appendix on procedural grounds or should at least decline to consider the documents. Because the Commission has not filed a formal motion to strike the respondents' appendix, we decline to issue such an order. However, because the documents were not accompanied by a request for judicial notice and because they pertain to an issue that is not relevant to our resolution of this appeal, we accordingly decline to consider them.

36

shall not 'be taken for public use, without just compensation.' " (*Lingle v. Chevron U.S.A. Inc.* (2005) 544 U.S. 528, 536-537.).)

One instance in which a violation of the takings clause may occur is "[u]nder the well-settled doctrine of 'unconstitutional conditions,' " under which "the government may not require a person to give up a constitutional right—here the right to receive just compensation when property is taken for a public use—in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property." (*Dolan v. City of Tigard* (1994) 512 U.S. 374, 385.)  Although the Lindstroms' takings clause argument is not well focused, they appear to rely mainly on the unconstitutional conditions doctrine for their attack on special condition 3.a. Specifically, the Lindstroms contend that special condition 3.a "unreasonably compels the complete and total forfeiture of the right to shoreline protection as a condition to using and developing property."

" 'The doctrine of unconstitutional conditions limits the government's power to require one to surrender a constitutional right in exchange for a discretionary benefit.' [Citations.]  In the takings context, the United States Supreme Court has held 'the government may impose such a condition only when the government demonstrates that there is an "essential nexus" [citation] and "rough proportionality" [citation] between the required dedication and the projected impact of the proposed land use.' ([*California Building Industry Assn. v. City of San Jose* (2015) 61 Cal.4th 435,] 458 citing *Nollan v. Cal. Coastal Com.* (1987) 483 U.S. 825 . . . and *Dolan v. City of Tigard* (1994) 512 U.S. 374 . . . .)  This test for determining whether a condition is unconstitutional is commonly

37

referred to as the '*Nollan/Dolan* test' [citations] and is viewed as a type of 'heightened scrutiny.' " (*Beach & Bluff Conservancy*, *supra*, 28 Cal.App.5th at p. 266.)

" ' "[A] predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing." [Citation.] Or, in other words, the condition is one that would have constituted a taking of property without just compensation if it were imposed by the government on a property owner outside of the permit process.' (*California Building*, *supra*, 61 Cal.4th at pp. 459-460.) The unconstitutional conditions doctrine applies only where the condition at issue constitutes an 'exaction' in the form of either the conveyance of a property interest or the payment of money; the doctrine does not apply where the government simply restricts the use of property without demanding an exaction. (*Id.* at pp. 457, 460.)" (*Beach & Bluff Conservancy*, *supra*, 28 Cal.App.5th at p. 266.)[32]

---

[32] We note that as a premise of their unconstitutional conditions argument, the Lindstroms appear to assume that they possess a *right* to build a seawall to protect structures on their property, and that the Commission is improperly requiring them to surrender that right as condition for obtaining a permit. Specifically, they argue that the special condition improperly compels "forfeiture *of the right* to shoreline protection." (Italics added.) However, that premise fails because "[i]n general, an individual has no 'vested right to protect property in a particular manner where the method chosen is one that is regulated by government . . . .' " (*Barrie v. California Coastal Com.* (1987) 196 Cal.App.3d 8, 15 [upholding Commission permit condition for seawall construction that required removal of a temporary seawall].) There is no question that the construction of a seawall is a highly regulated area covered, at a minimum, by the Coastal Act and the City's LCP. There is no guarantee that any future application to build a seawall would be approved to protect the Lindstroms' property, even if they did not agree to the waiver required by special condition 3.a. Moreover, as the Commission points out, the Lindstroms' real property does not even extend all the way down the face of the bluff to

38

The Lindstroms argue that the Commission's imposition of special condition 3.a violates the unconstitutional conditions doctrine because it "has no relationship or nexus to any impacts, identified or not, associated with the development of the property" and thus fails the essential nexus requirement of the *Nollan/Dolan* test. The Lindstroms' argument lacks merit because special condition 3.a is not the type of permit condition that is subject to unconstitutional conditions doctrine. As we have discussed, "[t]he unconstitutional conditions doctrine does not apply 'where the government simply *restricts* the use of property without demanding the conveyance of some identifiable protected property interest (a dedication of property or the payment of money) as a condition of approval.' (*California Building*, 61 Cal.4th at p. 460, italics added.)" (*Beach & Bluff Conservancy*, *supra*, 28 Cal.App.5th at p. 271.) In *Beach & Bluff Conservancy* this court specifically considered a requirement in Solana Beach's LCP that all permits for ocean front development on a bluff " 'shall require the property owner [to] record a deed restriction against the property that expressly waives any future right that may exist pursuant to Section 30235 of the Coastal Act to new or additional bluff retention devices.' " (*Id*. at p. 270.) We concluded that the unconstitutional conditions doctrine did not apply because no conveyance of a property interest or payment of money was involved. We explained, "[the provision in Solana Beach's LCP] does not require a conveyance of money or property; it requires the property owner to

the public beach where a seawall would likely be constructed. Thus, a permit to build a seawall would likely involve obtaining permission to undertake construction on a public beach—a complicated matter that likely would require additional government involvement and approval.

record a deed *restriction* against the property that expressly waives any future right under [Public Resources Code,] section 30235 to new or additional bluff retention devices. Because [the provision] simply restricts the use of property without demanding an exaction of a property interest or money as a condition of approval, the unconstitutional conditions doctrine does not apply." (*Beach & Bluff Conservancy*, at p. 271.)  The same reasoning applies here.  Special condition 3.a does not require a conveyance of a property interest or the payment of money; it simply requires an agreement that no seawall will ever be constructed to protect the structure that the Lindstroms propose to build on the bluff.

Even without reliance on the unconstitutional conditions doctrine, an unconstitutional taking may occur in certain instances when the government imposes a land use regulation.  As the Supreme Court has explained, " 'while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.' " (*Lucas v. South Carolina Coastal Council* (1992) 505 U.S. 1003, 1014 (*Lucas*).) Although " 'regulatory takings' jurisprudence [has] generally eschewed any ' "set formula" ' for determining how far is too far, preferring to 'engag[e] in . . . essentially ad hoc, factual inquiries' " there are "at least two discrete categories of regulatory action as compensable without case-specific inquiry into the public interest advanced in support of the restraint.  The first encompasses regulations that compel the property owner to suffer a physical 'invasion' of his property." (*Id*. at p. 1015.)  "The second situation . . . is where regulation denies all economically beneficial or productive use of land." (*Ibid*.)

40

Apparently referring to the foregoing takings clause jurisprudence, the Lindstroms argue that special condition 3.a constitutes a taking because "if it ultimately becomes necessary to protect the . . . home from danger of erosion" the special condition "would effectively take their property for public use, as dangerous conditions would prevent the Lindstroms (or their successors) from continuing to reside in their home, and they would be barred from any opportunity to stabilize the bluff." This possible scenario, the Lindstroms argue, "constitutes the imposition of an unconstitutional taking, without compensation, at some point in the unknown future."

However, neither situation that the Supreme Court has identified as categorically establishing an unconstitutional taking based on government regulation of land is present here. (*Lucas*, *supra*, 505 U.S. at p. 1015.)

First, special condition 3.a does not involve any physical invasion of the Lindstroms' property by the government. (*Lucas*, *supra*, 505 U.S. at p. 1015.) Although the bluff may eventually recede without the construction of a seawall, that condition would be caused by forces of nature, not by governmental intrusion.

Second, the Lindstroms cannot establish that special condition 3.a would deny them *all* economically beneficial or productive use of their land. (*Lucas*, *supra*, 505 U.S. at p. 1015.) As the Commission observed, the Lindstroms will be able to build a significant size home on the Lot. Although the structure on the bluff may eventually, as the years progress, become uninhabitable due to bluff failure, the Lindstroms or their successors will still own the real property. At an appropriate time in the distant future after the bluff recedes, it is possible that the structure the Lindstroms built could be

41

replaced and located on a more stable part of the Lot. At that time, the appropriate governmental authorities can make a decision about what use of the real property is safe and appropriate under existing conditions and in consideration of the property owners' rights under the takings clause to make economically beneficial use of their land. Therefore, the Lindstroms cannot establish that special condition 3.a deprives them of all economically beneficial use of their real property.[33]

In sum, we conclude that the Commission did not abuse its discretion or violate the takings clause in imposing special condition 3.a. The trial court accordingly erred in granting relief to the Lindstroms on special condition 3.a.

---

[33] We note that in addition to the two categorical types of regulatory takings resulting from land use restrictions, the Supreme Court has also described a multifactor approach. "Where a regulation places limitations on land that fall short of eliminating *all* economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action." (*Palazzolo v. Rhode Island* (2001) 533 U.S. 606, 617, italics added, citing *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124.) The Lindstroms make no attempt to show that special condition 3.a constitutes a taking under this multifactor approach. Moreover, we do not attempt to undertake such an analysis here as it is not ripe in that it depends on many future variables and contingencies regarding the possible condition of the bluff after years of erosion and the extent of the economically beneficial use that could be made of the Lot at that time. " ' "It follows from the nature of a regulatory takings claim that an essential prerequisite to its assertion is a final and authoritative determination of the type and intensity of development legally permitted on the subject property. A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." ' " (*Dryden Oaks, LLC v. San Diego County Regional Airport Authority* (2017) 16 Cal.App.5th 383, 396.)

4.      *Special Condition 3.b Is Overbroad and Therefore Unreasonable As*
        *Currently Drafted*

In their cross-appeal, the Lindstroms challenge the Commission's imposition of

special condition 3.b, which states,

> "[3.b] By acceptance of this Permit, the applicants further agree, on behalf
> of themselves and all successors and assigns, that the landowner shall
> remove the development authorized by this Permit, including the residence
> and foundation, if any government agency has ordered that the structures
> are not to be occupied due to any of the hazards identified above.  In the
> event that portions of the development fall to the beach before they are
> removed, the landowner shall remove all recoverable debris associated with
> the development from the beach and ocean and lawfully dispose of the
> material in an approved disposal site.  Such removal shall require a coastal
> development permit."

The Lindstroms argue that this special condition is impermissible because the

City's LCP does not give the Commission the authority to impose it.  In advancing this

argument, the Lindstroms acknowledge that the City's LCP touches upon the subject of

the removal of unsafe structures built on a coastal bluff.  Specifically, the LCP states that

"[a]ny new construction shall be specifically designed and constructed such that it could

be removed in the event of endangerment . . . ."  (Encinitas Mun. Code,

§ 30.34.020B.1.a.)[34]  However, the Lindstroms point out that this provision "has only to

do with building design and construction" and "does *not* state or imply that the

homeowners *must* remove their home" when certain conditions arise.

---

[34]     Similarly, another provision in the City's LCP states with respect to coastal bluffs:
"In all cases, all new construction shall be specifically designed and constructed such that
it could be removed in the event of endangerment."  (Encinitas General Plan and Local
Coastal Program Land Use Plan, Public Safety Element, Policy 1.6(f).)

The unstated premise of the Lindstroms' argument is that the Commission is not entitled to impose special conditions unless those conditions are *expressly authorized* by the City's LCP. However, that premise fails, because, as we have explained, the Coastal Act gives the Commission authority to impose "reasonable terms and conditions" on "[a]ny permit that is . . . approved on appeal, . . . in order to ensure that such development or action will be in accordance with the provisions of this division." (Pub. Resources Code, § 30607.) Although the permit conditions imposed by the Commission on appeal must not be inconsistent with the local government's LCP and the Coastal Act (*Schneider*, *supra*, 140 Cal.App.4th at pp. 1345-1348), and must be reasonable, they need not be *expressly* authorized by the LCP.

Here, special condition 3.b is consistent with the City's LCP. As we have quoted above, the City's LCP requires that blufftop construction be designed so that can be removed in the event of endangerment. Special condition 3.c is consistent with this provision, as it furthers the apparent intent behind it. There would be little reason for a coastal development permit to require that a structure be designed so that it can be removed in the event of endangerment if the permit does not also contain a provision to *effectuate* the removal when endangerment arises.

A special condition imposed by the Commission must also be reasonable. (Pub. Resources Code, § 30607.) The Lindstroms argue that special condition 3.b is not reasonable for two reasons, although they frame the argument in terms of due process.

First, focusing on the breadth of the language in special condition 3.b, the Lindstroms argue that it violates their right to procedural due process because "(1) it

44

allows '*any* government agency' —regardless of what substantive standards and procedural rules do or do not apply to such unknown agency—to order the Lindstroms to vacate and remove their home; (2) it does not require such agency to provide any legal or factual basis for its order; (3) it does not require any prior notice to the Lindstroms; (4) it does not require any sort of individualized hearing; and (5) it does not provide for any means of reviewing or contesting the agency's order."[35]

Second, also focusing on the breadth of the language in special condition 3.b, the Lindstroms contend that the condition violates their right to substantive due process because "it does not require the government to assert any justification for the removal of the house." According to the Lindstroms,

> "Though the condition requires the presence of one or more 'hazards' as a prerequisite for removal, it does not require the government to provide proof that such hazards exist or to find that such hazards are an imminent threat to cause serious injury to the house, its occupants, neighboring properties, or the public. Thus, under Special Condition 3(b), '*any* government entity' could order the house 'not to be occupied' without any justification, or with unsupported claims about the impact of projected sea-level rise and future erosion of the bluff. Such an order would trigger the requirement that the Lindstroms remove their house and foundation, even if they were not likely to be affected for many decades into the future. Moreover, Special Condition 3(b) does not require the government to find that a purported hazard is permanent and unavoidable; the condition could theoretically be triggered by a temporary, or even minor, 'hazard.'

---

[35] "The federal and state Constitutions prohibit the government from depriving persons of property without due process of law. (U.S. Const., 5th Amend.; Cal. Const., art. I, § 7, subd. (a).) Adjudicative governmental actions that implicate significant or substantial property deprivation generally require the procedural due process protections of reasonable notice and an opportunity to be heard." (*Venice Coalition to Preserve Unique Community Character v. City of Los Angeles* (2019) 31 Cal.App.5th 42, 49.)

45

"Indeed, the 'hazards' that would trigger Special Condition 3(b) are defined extremely vaguely and overbroadly. The condition references 'any of the hazards identified above' but does not specify which hazards they are. . . . The previous paragraph describes threats of 'damage or destruction from waves, erosion, storm conditions, bluff retreat, landslides, or other natural hazards in the future.' . . . Assuming these are the hazards that the Commission has in mind, such 'hazards' are *always* present in a coastal environment. Special Condition 3(b) thus is overbroad. As noted, it would allow any government entity to declare at any time that, due to projected sea-level rise, the Lindstroms' home should not be occupied because it is threatened with potential 'damage or destruction from waves, erosion, storm conditions, bluff retreat, landslides, or other natural hazards *in the future*.' . . . The Lindstroms would then be forced to remove their home and foundation—presumably at their own expense."[36]

In response to the Lindstroms' procedural due process and substantive due process arguments, the Commission argues that the Lindstroms have misapprehended the purpose of special condition 3.b. According to the Commission, "the condition addresses only what happens *after* the [C]ity condemns the home." The Commission contends that the procedures and standards that the City must follow in condemning a home and determining it to be uninhabitable are set forth in separate laws and ordinances, and that those laws provide the Lindstroms with the required procedural and substantive due process protections. Implicit in the Commission's argument is an assumption that special condition 3.b is intended to apply only when the appropriate governmental agency makes

---

[36] " 'Substantive due process protects against "arbitrary legislative action, even though the person whom it is sought to deprive of his right to life, liberty or property is afforded the fairest of procedural safeguards." [Citation.] ' ". . . Even where state officials have allegedly violated state law or administrative procedures, such violations do not ordinarily rise to the level of a constitutional deprivation." ' [Citation] Rather, '[a] substantive due process violation requires some form of outrageous or egregious conduct constituting a "true abuse of power." ' " (*Bottini v. City of San Diego* (2018) 27 Cal.App.5th 281, 315.)

46

a valid order under existing law, after all possible appeals or writ proceedings regarding the agency's decision are final, that the Lindstroms' home is *currently* and *permanently* uninhabitable due to *bluff instability* caused by natural forces. Indeed, the Commission's findings and declarations in its administrative decision suggests this more narrow focus: "Should the blufftop residence become unstable or structurally unsound, without construction of new shoreline armoring, or if any government agency orders that the structure is not to be occupied due to failure and erosion of the bluff, the applicants must agree to remove the subject structure, in part or entirely and remove and dispose of any debris that fall to the beach."

In response, the Lindstroms state that although they understand the Commission's position, "[i]f, as the Commission suggests, the purpose of the condition is simply to ensure that the structures do not become a nuisance *after* they have been condemned according to law, then the Commission should have drafted the language much more narrowly and precisely." We agree with the Lindstroms that in light of the Commission's intent in requiring special condition 3.b, the language of the special condition is not well drafted and does not reasonably achieve what the Commission intended. As we will explain, in two respects the language of special condition 3.b could be interpreted to require the Lindstroms to remove the home from the Lot under circumstances that are not reasonable and are not related to any concern for bluff stability.

First, although the Commission states that special condition 3.b is meant to apply if the home is made uninhabitable "due to failure and erosion of the bluff," the special condition, when read literally, could apply much more broadly. Specifically, special

condition 3.b requires the Lindstroms to agree that "the landowner shall remove the development authorized by this Permit, including the residence and foundation, if any government agency has ordered that the structures are not to be occupied *due to any of the hazards identified above*." (Italics added.) The "hazards identified above" appear in special condition 3.a, which refers to "damage or destruction from waves, erosion, storm conditions, bluff retreat, landslides, *or other natural hazards in the future*." (Italics added.) Because the hazards at issue are broadly and inclusively defined to include "other natural hazards," and are not limited to natural hazards relating to bluff instability, when read literally, special condition 3.b could require the Lindstroms to remove their home from the Lot even if it is determined to be uninhabitable due to natural hazards that have nothing at all to do with bluff instability or its blufftop location. For example, special condition 3.b might be interpreted to require removal of the home if it became uninhabitable from strong winds, fire, damage from a falling tree, toxic mold or rodent infestation, as each of those problems might be described as a "natural hazard."

Second, special condition 3.b, when read literally, would require the Lindstroms to remove their home from the Lot even if a government agency determines that the Lindstroms' home is only *temporarily* uninhabitable, and even if the dangerous condition can be *remedied* in some manner (not including any bluff or shoreline protective device that is prohibited by special condition 3.a.), without tearing down and removing the home. Specifically, the special condition states that "the landowner shall remove the development authorized by this Permit, including the residence and foundation, if any government agency has ordered that the structures are not to be occupied . . . ," but it

48

does not require that the government make a determination that the structures are permanently uninhabitable and must be condemned because they cannot be made habitable through any means short of constructing bluff or shoreline protective devices.[37]

We therefore conclude that based on the two considerations set forth above, as currently drafted special condition 3.b is not a reasonable special condition that the Commission is authorized to impose under Public Resources Code section 30607. Accordingly, a writ of mandate should issue requiring that special condition 3.b be deleted unless it is revised to clarify that the landowner is required to remove the development authorized by the permit if the City or any other government agency with legal jurisdiction has issued a final order, after any appeal or writ proceedings, determining that the structures are currently and permanently unsafe for occupancy due to bluff failure or erosion of the bluff, and that there are no measures that could make the structures suitable for habitation without the use of bluff or shoreline protective devices.

5. *The Commission Did Not Abuse Its Discretion in Imposing Special Condition 3.c*

Finally, the Lindstroms' cross-appeal also challenges special condition 3.c, which provides,

"[3.c] In the event the edge of the bluff recedes to within 10 feet of the principal residence but no government agency has ordered that the structures not be occupied, a geotechnical investigation shall be prepared by a licensed coastal engineer and geologist retained by the applicants, that

---

[37] In addition, the Commission acknowledges that the government agency decision referred to in special condition 3.b is intended to be a *final* agency decision after any possible writs or appeals are resolved. The language in special condition 3.b should therefore be revised to more expressly reflect that position.

49

addresses whether any portions of the residence are threatened by wave, erosion, storm conditions, or other natural hazards. The report shall identify all those immediate or potential future measures that could stabilize the principal residence without shore or bluff protection, including but not limited to removal or relocation of portions of the residence. The report shall be submitted to the Executive Director and the appropriate local government official. If the geotechnical report concludes that the residence or any portion of the residence is unsafe for occupancy, the permittee shall, within 90 days of submitting the report, apply for a coastal development permit amendment to remedy the hazard, which shall include removal of the threatened portion of the structure.

In challenging this special condition, the Lindstroms incorporate arguments that we have already considered and rejected in connection with other special conditions. Specifically, we have determined that the Commission may require the Lindstroms to waive any future right to build a seawall to protect the structure they propose to build on the Lot, and we have determined that the Commission has the authority to impose special conditions even though they are not expressly required by the City's LCP, as long as they are not inconsistent with the LCP or the Coastal Act and are otherwise reasonable.[38]

In their reply brief to their cross-appeal, the Lindstroms also make a cursory argument that special condition 3.c is generally unreasonable and would force the Lindstroms to "sacrifice their constitutional rights to substantive and procedural due process." However, the argument is not developed, and we do not perceive any of the problems with the wording of special condition 3.c that are present in special condition 3.b. Indeed, unlike special condition 3.b, special condition 3.c acknowledges that

---

[38]   Special condition 3.c is not inconsistent with the City's LCP. Like special condition 3.b, special condition 3.c relates to the requirement in the City's LCP that bluff top construction "be specifically designed and constructed such that it could be removed in the event of endangerment . . . ." (Encinitas Mun. Code, § 30.34.020B.1.a.)

50

measures short of removal of the structure may be feasible to make it habitable if it is threatened by bluff failure.

## DISPOSITION

The judgment is reversed and the trial court's writ of administrative mandate is vacated. We remand with directions for the trial court to issue a new writ of administrative mandate ordering the Commission to either delete special condition 3.b or to revise it to provide that the landowner is required to remove the development authorized by the permit if the City or any other government agency with legal jurisdiction has issued a final order, after any appeal or writ proceedings, determining that the structures are currently and permanently unsafe for occupancy due to bluff failure or erosion of the bluff, and that there are no measures that could make the structures suitable for habitation without the use of bluff or shoreline protective devices. In all other respects, the special conditions set forth in the Commission's decision may remain in effect.

                                                                IRION, J.

WE CONCUR:


HALLER, Acting P. J.


GUERRERO, J.